**Affirmed in part, Reversed in part and Remanded and Opinion Filed
September 28, 2020**



**In The**

**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-00105-CV**

**UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER,**
**Appellant**
**V.**
**ELLEN S. VITETTA, Appellee**

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-09146**

## MEMORANDUM OPINION

Before Justices Molberg and Partida-Kipness[1]
Opinion by Justice Molberg

The University of Texas Southwestern Medical Center (UTSWMC) appeals

the denial of its plea to the jurisdiction[2] on Dr. Ellen S. Vitetta's third amended

---

[1] The Honorable David Bridges, Justice, participated in the submission of this case. However, he did not participate in the issuance of this opinion due to his death on July 25, 2020.

[2] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (allowing interlocutory appeal of order granting or denying a plea to the jurisdiction by a governmental unit as defined in TEX. CIV. PRAC. & REM. CODE § 101.001); *Powell v. Knipp*, 479 S.W.3d 394, 399 (Tex. App.—Dallas 2015, pet. denied) ("[a]s a matter of law, UTSWMC is a 'governmental unit' within the meaning of section 101.001(3)").

petition, in which she asserts claims of age discrimination, sex discrimination and retaliation under the Texas Commission on Human Rights Act (TCHRA).[3]

We affirm in part and reverse and dismiss in part.

## I. CLAIMS AT ISSUE

Dr. Vitetta asserts age discrimination, sex discrimination, and retaliation claims against UTSWMC under TCHRA sections 21.051 and 21.055, which state:

**TEX. LAB. CODE § 21.051 – Discrimination by Employer**[4]

An employer commits an unlawful employment practice if because of . . . sex . . . or age[5] the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

**TEX. LAB. CODE § 21.055 – Retaliation**

An employer . . . commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who, under this chapter:

(1) opposes a discriminatory practice;

(2) makes or files a charge;

---

[3] *See* TEX. LAB. CODE § 21.001–.556.

[4] "Employer" includes state agencies or instrumentalities. TEX. LAB. CODE § 21.002(8)(D).

[5] For age discrimination claims, the TCHRA only applies to discrimination against individuals 40 years of age or older. TEX. LAB. CODE § 21.101.

(3) files a complaint; or

(4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

Dr. Vitetta alleges UTSWMC discriminated or retaliated against her by (1) cutting her salary by $50,000 per year, (2) cutting her lab space and staff and interfering with her efforts to maintain them, and (3) sabotaging her role as president of UTSWMC's Faculty Senate. She claims age and sex discrimination in her salary and lab cuts and retaliation in her lab cuts and her Faculty Senate role.[6]

## II. BACKGROUND

### A. Dr. Vitetta's General Role at UTSWMC

UTSWMC describes Dr. Vitetta as "an accomplished research scientist and respected member of [UTSWMC's] faculty." A UTSWMC colleague describes her as "one of the most accomplished immunologists and microbiologists in the world."

Dr. Vitetta is an internationally renowned, award-winning and distinguished professor, researcher, educator and inventor in the scientific field of immunology.

Dr. Vitetta is a full, tenured UTSWMC professor and has served as a Professor of Microbiology and Immunology at UTSWMC since 1976, for over forty years. She was born in June 1942 and is now seventy-eight years old.

---

[6] Dr. Vitetta complained of discrimination in connection with her salary and lab cuts as early as July 23, 2015. She asserts that UTSWMC's lab cuts and sabotage to her Faculty Senate role were in retaliation for her protected activity through her internal complaints to UTSWMC, to the EEOC, and in this lawsuit.

She is a past Chair of UTSWMC's Immunology Graduate Program, and was Director of UTSWMC's Cancer Immunobiology Center (CIC) for approximately twenty-five years. She has held UTSWMC's Scheryle Simmons Patigian Distinguished Chair in Cancer Immunobiology since 1989 and was the first female to receive a Distinguished Chair position at UTSWMC.

She is an elected member of the National Academy of Sciences, the National Academy of Medicine, and the American Academy of Arts and Sciences. Fewer than fifteen individuals at UTSWMC have been elected to all three. Dr. Vitetta has published over 500 scientific papers, reviews, and articles in various scientific journals and has one of the most extensive publication records of any member of UTSWMC's faculty.

UTSWMC named Dr. Vitetta a Distinguished Teaching Professor in 2006. She won UTSWMC's Outstanding Faculty Teaching Award for many years (1989, 1991–96, 1999–2007), was among the first faculty "class" to be elected to the Southwestern Academy of Teachers in 2006, and received statewide teaching awards in 2006, 2011, and 2012. According to Dr. Vitetta, she is the only UTSWMC faculty member who has accomplished widespread recognition for both teaching and scientific excellence and productivity and is the only UTSWMC faculty member whose graduate student has gone on to win the Nobel Prize.

To support her research activities, Dr. Vitetta has raised approximately $50 million in research funding through National Institute of Health (NIH) grants,

–4–

other public and private grants, contracts, sponsored research agreements, material transfer agreements, license fees and royalties, cooperative agreements, or other sponsored programs or donations. UTSWMC receives an additional thirty to fifty-nine percent over and above these amounts for its own use. She has also founded four companies and raised money for all of them, including most recently Enterprise Mimetics, which in turn funded one of her UTSWMC research projects.[7]

We discuss the parties' other evidence below.

## B. UTSWMC's Plea to the Jurisdiction & Issues on Appeal

Dr. Vitetta filed this lawsuit on July 29, 2016. In late 2018, UTSWMC filed a plea to the jurisdiction in response to her third amended petition. The trial court denied that plea in an order dated January 9, 2019.[8] UTSWMC appeals.

In three broad issues,[9] UTSWMC asks us to reverse that order and render judgment on the following, as well as on a retaliation claim she has not made:[10]

- *Salary & Lab Cuts / Age & Sex Discrimination Claims* – UTSWMC challenges the adverse action element regarding her lab cuts and the disparate

---

[7] Dr. Vitetta founded Enterprise Mimetics as a joint endeavor with UT Austin's MBA Program. It established an SRA with UTSWMC to fund her lab for $35,000 per month, payable monthly and renewable every three months beginning February 2014. By 2016, funding totaled $611,000.

[8] UTSWMC also filed pleas to the jurisdiction in response to her original, first amended, and second amended petitions, but none of them were granted. UTSWMC did not appeal any of those rulings.

[9] UTSWMC argues "Dr. Vitetta failed to meet her burden to overcome its sovereign immunity" on (1) her retaliation claims, (2) her sex discrimination claims and (3) her age discrimination claims. When we refer to UTSWMC's issues by number (e.g. "UTSWMC's first issue"), our numbers correspond with the order listed here, not the order of the bullet points we include above.

[10] UTSWMC also asks us to reverse and render judgment on a retaliation claim regarding her salary cut. Dr. Vitetta did not address that claim in her brief, and neither party raised it in oral argument. We do not decide that issue here because the record does not show such a claim was made or ruled on below.

treatment and pretext elements regarding the cuts to her salary and her lab. We discuss and overrule these issues in Section III.B. below.

- *Lab Cuts / Retaliation Claim* – UTSWMC challenges the adverse action, causal connection, and pretext elements of her lab-related retaliation claim. We discuss and sustain the causal connection issue in Section III.C. below.

- *Faculty Senate Role / Retaliation Claim* – UTSWMC challenges the adverse action and causal connection elements of her prima facie retaliation claim regarding her Faculty Senate role. We discuss and overrule this in Section III.D. below.

## III.  DISCUSSION

### A.    General Review Standards

### 1.    Sovereign Immunity[11]

Sovereign immunity "prohibits suits against the state unless the state consents and waives its immunity." *Nazari v. State*, 561 S.W.3d 495, 500 (Tex. 2018); *see State v. Allodial Ltd. P'ship*, 280 S.W.3d 922, 925–26 (Tex. App.—Dallas 2009, no pet.) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004)).  Sovereign immunity has two aspects:  "(1) immunity from suit even when the sovereign's liability is not disputed, and (2) immunity from liability even though

---

[11] Though they are often used interchangeably, sovereign immunity and governmental immunity protect distinct entities. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 n.56 (Tex. 2019).  Sovereign immunity refers to the State's immunity from suit and from liability and protects the State and its various divisions, including agencies, boards, hospitals and universities, while governmental immunity protects political subdivisions such as counties and municipalities who share the State's immunity when performing governmental functions as the State's agent. *Id*. at 746, n.57.  Other differences in the two doctrines exist, *see id*. at 740, 746–47, but we do not discuss those further because they are not material to the issues presented here. *See Ellis v. Dallas Area Rapid Transit*, No. 05-18-00521-CV, 2019 WL 1146711, at *2 n.3 (Tex. App.—Dallas Mar. 13, 2019, pet. denied) (mem. op.).  Throughout our opinion, we refer to sovereign immunity, as UTSWMC is a part of The University of Texas System. *See* TEX. EDUC. CODE §§ 65.02(a)(7), 74.101.

the sovereign has consented to the suit." *Rosenberg Dev. Corp.*, 571 S.W.3d at 746; *see Allodial*, 280 S.W.3d at 926 (citing *Miranda*, 133 S.W.3d at 224). Immunity from suit can be raised in a plea to the jurisdiction and implicates the court's subject matter jurisdiction, while immunity from liability does not and cannot be raised by such a plea. *Rosenberg Dev. Corp.*, 571 S.W.3d at 746; *see Allodial*, 280 S.W.3d at 926 (citing *Miranda*, 133 S.W.3d at 224–26).

For the State to waive its sovereign immunity, the legislature must do so "'by clear and unambiguous language.'" *Nazari*, 561 S.W.3d at 500 (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 328–39 (Tex. 2006)); *Ellis*, 2019 WL 1146711, at *2; TEX. GOV'T CODE § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."). Unless waived, immunity from suit deprives a court of jurisdiction. *Ellis*, 2019 WL 1146711, at *2. However, a waiver need not be express, for "when a waiver of immunity has been necessary to make sense of a statute, [the Texas Supreme Court has] held it to be clear and unambiguous." *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 58 (Tex. 2011); *Ellis*, 2019 WL 1146711, at *2. "The clear and unambiguous standard is never applied 'mechanically to defeat the law's purpose or the Legislature's intent.'" *Ellis*, 2019 WL 1146711, at *2 (quoting *Norman*, 342 S.W.3d at 58).

## 2.     TCHRA Generally

The TCHRA clearly and unambiguously waives sovereign immunity, but only if a claimant states a claim for conduct that actually violates the statute.  *See Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018) (citing *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 637 (Tex. 2012); TEX. LAB. CODE § 21.254 (complainants may bring private civil action)).

Among its other general purposes,[12] the TCHRA is meant to secure for persons in this state freedom from discrimination in certain employment transactions, to make available to the State the full productive capacities of persons in the State, and to provide for the execution of the policies of various federal employment discrimination laws. TEX. LAB. CODE § 21.001(1), (3)–(5).   The TCHRA also prohibits retaliation against an employee for engaging in certain protected activities, such as by filing an internal complaint of discrimination, opposing a discriminatory practice, or making a charge of discrimination with the EEOC or Texas Workforce Commission–Civil Rights Division.  *See Alamo Heights*, 544 S.W.3d at 781, 786; TEX. LAB. CODE § 21.055.

In interpreting the TCHRA, we consider its plain language and state law precedent and look to federal law for guidance when the TCHRA and federal

---

[12] *See* TEX. LAB. CODE § 21.001(1)–(8).

discrimination laws contain analogous statutory language. *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 505 (Tex. 2012).

Under the TCHRA, unlawful employment practices can be established when age, sex, or other identified characteristics are "a motivating factor" for an employment practice, even if other factors also motivated the practice. TEX. LAB. CODE § 21.125(a); *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("The plain meaning of this statute establishes 'a motivating factor' as the plaintiff's standard of causation in a TCHRA unlawful employment practice claim, regardless of how many factors influenced the employment decision.").[13]

### 3. Standard of Review on a Plea to the Jurisdiction

Whether a court has subject matter jurisdiction is a question of law and is thus subject to de novo review. *Miranda*, 133 S.W.3d at 226, 228; *Ellis*, 2019 WL 1146711, at *2. In *Alamo Heights*, the Texas Supreme Court explained:

---

[13] *But see Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII retaliation claims require "but for" causation); *Alamo Heights*, 544 S.W.3d at 782–83 (stating Texas Supreme Court had "yet to determine the appropriate causation standard for a TCHRA retaliation claim"); *Crutcher v. Dallas Indep. Sch. Dist.*, 410 S.W.3d 487, 494 (Tex. App.—Dallas 2013, no pet.) (TCHRA retaliation claims require "but for" causation; employee must show that, in the absence of the employee's protected activity, the employer's prohibited conduct would not have occurred when it did) (citing *Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995), a Whistleblower Act case) (other citations omitted).

Incidentally, we note that *Nassar* involved the same appellant and at least one of the same individuals (Dr. Fitz) as in the case before us. 570 U.S. at 344–45. *Nassar* involved a Title VII retaliation claim in which the plaintiff, Dr. Nassar, alleged he had been retaliated against based on his complaint that his UTSWMC supervisor had harassed him "based on religious, racial, and cultural bias against Arabs and Muslims." According to the opinion, after Dr. Fitz read Dr. Nassar's complaint, Dr. Fitz "expressed consternation at [Dr. Nassar's] accusations, saying that [his supervisor] had been 'publicly humiliated by [the] letter' and that it was 'very important that [the supervisor] be publicly exonerated." *Id*. at 345. Also, after Dr. Fitz learned an affiliated hospital had offered Dr. Nassar a job as a staff physician, Dr. Fitz protested to the hospital based on its affiliation agreement with UTSWMC, and the hospital withdrew its employment offer to Dr. Nassar. *Id*.

A jurisdictional plea may challenge the pleadings, the existence of jurisdictional facts, or both. When [it] challenges the pleadings, we determine if the plaintiff has alleged facts affirmatively demonstrating subject-matter jurisdiction. If [it] challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim.

[In the latter situation], the standard of review mirrors that of a traditional summary judgment: '[I]f the plaintiffs' factual allegations are challenged with supporting evidence necessary to consideration of the plea to the jurisdiction, to avoid dismissal plaintiffs must raise at least a genuine issue of material fact to overcome the challenge to the trial court's subject matter jurisdiction.' In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not.

*Alamo Heights*, 544 S.W.3d at 770–71 (quoting *Miranda*, 133 S.W.3d at 221) (other citations omitted). In TCHRA cases, questions regarding jurisdiction and the merits of the case often overlap, and when that occurs, the proceeding mirrors that of a traditional summary judgment motion. *See id.* at 770 (citing *Miranda*, 133 S.W.3d at 225–26); *Garcia*, 372 S.W.3d at 635 (citing *Miranda*, 133 S.W.3d at 228 and TEX. R. CIV. P. 166a(c)). *Miranda* explains:

We acknowledge that this standard generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c). We adhere to the fundamental precept that a court must not proceed on the merits of a case until legitimate challenges to its jurisdiction have been decided. . . . By requiring the state to meet the summary judgment standard of proof in cases like this one, we protect the plaintiffs from having to "put on their case simply to establish jurisdiction." *Bland*, 34 S.W.3d at

–10–

554.[14] Instead, after the state asserts and supports with evidence that the trial court lacks subject matter jurisdiction, we simply require the plaintiffs, when the facts underlying the merits and subject matter jurisdiction are intertwined, to show that there is a disputed material fact regarding the jurisdictional issue. *See Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000); *Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex.1999).

*Miranda*, 133 S.W.3d at 228; *see Allodial*, 280 S.W.3d at 926 (review generally mirrors that of a summary judgment under Rule 166a(c)). Here, UTSWMC challenged the existence of jurisdictional facts and submitted evidence with its plea. Thus, we review this as we would a traditional summary judgment motion, taking as true all evidence favorable to Dr. Vitetta, indulging every reasonable inference and resolving any doubts in her favor, while considering evidence and inferences unfavorable to her if reasonable jurors would be unable to disregard them. *See Alamo Heights*, 544 S.W.3d at 770–71.[15]

If UTSWMC satisfies its burden of negating certain elements, we then consider whether a genuine fact issue exists, including on UTSWMC's intent. *See*

---

[14] *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547 (Tex. 2000).

[15] In a traditional summary judgment motion, the movant must demonstrate there is no genuine issue of material fact and is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018). If it does so, the burden shifts to the non-movant to come forward with competent controverting evidence sufficient to raise a genuine issue of material fact. *Id.* at 84. On review, we consider the evidence in the light most favorable to the non-movant, making every reasonable inference and resolving all doubts in her favor. *See id.* We credit evidence favorable to the non-movant if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *See Samson Exploration, LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774 (Tex. 2017). Evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all the summary judgment evidence. *Lakshmi Realty, LLC v. Firewheel Brokerage PLLC*, No. 05-17-00142-CV, 2018 WL 1602583, at *2 (Tex. App.—Dallas Apr. 3, 2018, no pet.) (mem. op.) (citing *Lam v. Phuong Nguyen*, 335 S.W.3d 786, 789 (Tex. App.—Dallas 2011, pet. denied)).

–11–

*id.* at 785 ("Whether by jurisdictional plea or summary-judgment motion, the plaintiff is not put to the ultimate burden of proof but must only raise a fact issue on the existence of illegal intent."); *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 552 (Tex. 2019) ("when jurisdictional challenge implicating merits is properly made and supported, plaintiff must present sufficient evidence on the merits of the claims to create a genuine issue of material fact").

### 4. *McDonnell Douglas* Framework

Under the TCHRA, an unlawful employment practice is established when age, sex, or other protected characteristics are a "motivating factor" for the action, even if other factors also motivated the practice. *See* TEX. LAB. CODE § 21.125(a); *Quantum Chem.*, 47 S.W.3d at 480.

Discriminatory motive can be shown either with direct or circumstantial evidence. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653–54 (Tex. App.—Dallas 2012, no pet.) Circumstantial evidence, on the other hand, refers to evidence that requires an inference to be made regarding the employer's discriminatory motive. *Id.* ("If an inference is required for the evidence to be probative as to the employer's discriminatory animus in making the employment decision, the evidence is circumstantial, not direct.")

In the absence of direct evidence of discrimination, a plaintiff can prove unlawful employment discrimination using the indirect, circumstantial method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Garcia*, 372 S.W.3d at 634. Under that method, once a plaintiff establishes a prima facie case of discrimination, a presumption of discrimination exists, which shifts the burden to the employer to produce a legitimate, non-discriminatory reason for its actions; if the employer does so, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show the employer's asserted reasons were a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–05.

*McDonnell Douglas* involved Title VII race discrimination and retaliation claims by a former employee who sued after his employer refused to rehire him. *Id*. at 796. The trial court dismissed his race discrimination claim, and the court of appeals reversed. *Id*. at 797–98. After granting certiorari "to clarify the standards governing . . . employment discrimination," *id*. at 798, the Supreme Court explained the prima facie proof required as follows:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802.  The Court explained, "The facts necessarily will vary . . . and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations."  *Id*. at 802 n.13.

After *McDonnell Douglas*, the Supreme Court has repeatedly indicated that the prima facie case "is not intended to be an inflexible rule."  *See Young v. United Parcel Service, Inc.*, 575 U.S. 206, 228 (2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575 (1978)).  Immediately after that statement, *Young* states:

> Rather, an individual plaintiff may establish a prima facie case "by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under Title VII."

*Young*, 575 U.S. at 228 (quoting *Furnco*, 438 U.S. at 576).

The Supreme Court has also repeatedly stated that the prima facie burden is "'not onerous.'"  *Young*, 575 U.S. at 228 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)), a fact also acknowledged by the Texas Supreme Court in analyzing cases under the TCHRA.  *Garcia*, 372 S.W.3d at 634.  The prima facie burden "is not as burdensome as succeeding on an 'ultimate finding of fact as to' a discriminatory employment action."  *Young*, 575 U.S. at 228 (quoting *Furnco*, 438 U.S. at 576).

We have previously stated that "to establish a prima facie case of employment discrimination, a plaintiff must show (1) she was a member of a protected class, (2) she was qualified for her employment position, (3) she was subjected to an

adverse employment decision, and (4) she was replaced by someone outside of the protected class, or she was treated less favorably than similarly situated members of the opposite class." *Mesquite Indep. Sch. Dist. v. Mendoza*, 441 S.W.3d 340, 343 (Tex. App.—Dallas 2013, no pet.) (citing *Jespersen*, 390 S.W.3d at 654; *Michael v. City of Dallas*, 314 S.W.3d 687, 690–91 (Tex. App.—Dallas 2010, no pet.)).

Like discrimination claims, TCHRA retaliation claims can be established with either direct or circumstantial evidence, and for the latter, the *McDonnell Douglas* framework applies, but the elements differ. *Alamo Heights*, 544 S.W.2d at 782. To state a prima facie case of TCHRA retaliation, an employee must show (1) she engaged in protected activity under the TCHRA, (2) she experienced a material adverse employment action, and (3) a causal link exists between her protected activity and the adverse action. *Alamo Heights*, 544 S.W.2d at 782 (citing *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015)). The causal connection required at the prima facie stage is "not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Id*. Retaliation claims may be actionable under the TCHRA even if the underlying discrimination claim is not. *Id*. at 781.

While the prima facie standards discussed above are correct—in other words, a plaintiff *can* satisfy a prima facie case of discrimination or retaliation with such proof—it would be contrary to both the spirit and the statements of *McDonnell Douglas* and its progeny to apply these elements so rotely or so rigidly as to preclude

–15–

a trial of an employment discrimination case when there is proof of "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion" under anti-discrimination laws such as the TCHRA. *See, e.g.*, *Young*, 575 U.S. at 228 (citing *Furnco*, 438 U.S. at 576).

*McDonnell Douglas* makes clear that, even in situations where the employer articulates a legitimate, nondiscriminatory reason for the employer's action—thus meeting and eliminating the presumption created by the prima facie case—plaintiffs must be given "a full and fair opportunity to demonstrate by competent evidence that whatever the stated reasons for [the adverse employment action], the decision was in reality . . . premised" on a discriminatory basis. *McDonnell Douglas*, 411 U.S. at 805, n.18. This "full and fair opportunity" is meant to allow a plaintiff "to demonstrate by competent evidence that the presumptively valid reasons for [the adverse action] were in fact a cover-up for a . . . discriminatory decision." *Id*. at 805.

## B. Age and Sex Discrimination in Salary and Lab Cuts

### 1. The Parties' Evidence

With its plea, UTSWMC submitted documents and affidavits from certain UTSWMC faculty members and from two members of its executive leadership,

–16–

Dr. Gregory Fitz and Dr. Dwain Thiele.[16] Dr. Vitetta responded with her own affidavits and other evidence, including an affidavit from a UTSWMC colleague, Jerry Y. Niederkorn, Ph.D., a UTSWMC faculty member and Vice Chairman for Research who is familiar with Dr. Vitetta and others and who was on a review panel that reviewed Dr. Vitetta's performance for the period from 2010 to 2014.

### a.    UTSWMC's Evidence

#### 1)    Salary Cut and Reason Given in June 2015

In a June 4, 2015 letter, UTSWMC informed Dr. Vitetta it was reducing her salary by $50,000 per year "*due to the sustained absence of external grant support*" (emphasis added). Dr. Fitz and Dr. Wakeland, her supervisor, signed the letter.

#### 2)    Lab Cuts and Reason Given in June 2015

Five days later, in a June 9, 2015 letter, UTSWMC informed Dr. Vitetta her research lab and lab staff would no longer be available after August 31, 2015, stating:

> *The purpose of this letter is to inform you that space in the department will no longer be available after August 31, 2015. The space is required for other departmental needs.* This date nearly coincides with the date that your SRA[17] with Enterprise Mimetics comes to an end (September 1, 2015).

---

[16] J. Gregory Fitz, M.D. and Dwain Thiele, M.D. both served as UTSWMC's Executive Vice President for Academic Affairs and Provost, Dean of UT Southwestern Medical School (Dr. Fitz from 2009 to April 2018, and Dr. Thiele on an interim basis thereafter). They oversaw all academic affairs, including "faculty appointments, faculty salaries, faculty performance and research productivity, and allocation of research and academic space" at UTSWMC. Both served in these roles when they signed their affidavits. Dr. Fitz signed his affidavit on June 22, 2017. Dr. Thiele signed his affidavit on November 2, 2018.

[17] While not defined in the letter, other evidence indicates "SRA" refers to "sponsored research agreement," one type of extramural funding research faculty might obtain to support their research.

<u>Related Issues</u>

- *Faculty Office:* As a tenured professor . . . you may continue to maintain your office . . . but all other space will no longer be available to you after the end of this fiscal year.

- *Lab Staff*: Your staff will be subject to a reduction-in-force (RIF), for which they will be notified this month. . . .

- *Lab Closure Issues*: Since your staff will be RIF'd by the end of August, unless they find other employment, it is expected that you and your staff will handle all lab closure issues, such as the packing up and movement of your equipment, supplies, and other items out of the . . . space by the end of this fiscal year.

  - *Costs*: Costs associated with the packing up and movement of your equipment and supplies will be your responsibility.

. . . .

Sincerely,
/s/ Edward K. Wakeland, Ph.D.
Professor and Chairman

Cc: Greg Fitz, M.D., Dean
[emphasis added in first paragraph]

### 3) UTSWMC's Later Information Regarding Funding, Her Salary and Lab, and Other UTSWMC Faculty

Dr. Fitz and Dr. Thiele indicated that UTSWMC research faculty are responsible for financially supporting the equivalent of fifty percent of their own salary, the UTSWMC space they occupy, their equipment and supplies, and their staff, using extramural funding they garner from "NIH grants or other federal or state grants, contracts, sponsored research agreements, cooperative agreements, or other sponsored programs, to support their research activities." Both Dr. Fitz and

–18–

Dr. Thiele stated that Dr. Vitetta "has not had sufficient funding to meet that standard." According to Dr. Fitz, "Faculty's ability to finance their research directly impacts [UTSWMC's] business decisions regarding allocation of available space, salaries and staffing levels."

Dr. Thiele described different types of extramural funding at UTSWMC, drawing distinctions between awards from competitive peer-reviewed processes, private companies, licensing or material transfer agreements, and other sources, and he explained UTSWMC's considerations in including that funding (or not) in making its lab space allocations. He stated, "Although all extramural funding is considered in [UTSWMC's] business decisions regarding space and salaries, all sources of funding are not equal."

Dr. Fitz and Dr. Thiele stated UTSWMC had used institutional funds to cover a significant percentage of Dr. Vitetta's salary since 2012. Both provided specific percentages for certain years, all of which were over ninety percent.

According to Dr. Fitz, UTSWMC closed the CIC "due to Dr. Vitetta's failure to secure sufficient extramural funding for several years."[18] He stated, "Prior to and since the closing of the CIC in 2013, Dr. Vitetta has struggled to secure necessary extramural funding to support her research activities, in accordance with established

---

[18] The CIC had been housed within UTSWMC's Department of Microbiology. Dr. Fitz indicated that after the CIC's closure, Dr. Vitetta transferred to the Department of Immunology.

–19–

standards" and has "received significant institutional funding support" from UTSWMC as a result. He estimated this support as totaling "nearly $6 million."

Dr. Fitz stated the "contribution of University funds toward Dr. Vitetta's annual salary and nearly $6 million in additional money to support her research over an extended period of time far exceeds that provided to any other faculty member in Basic Sciences."

Dr. Fitz stated in his 2017 affidavit that Dr. Vitetta's salary was cut in 2015 "because of her sustained lack of extramural funding and because [her prior annual salary] was 72% higher than similarly situated Basic Sciences faculty." He also stated her "reduced salary . . . remains the highest of any of the 61 full professors in Basic Sciences who are also not center directors, Department Chairs, Vice Provost or Associate Dean."

Dr. Fitz and Dr. Thiele also provided information in their affidavits about other UTSWMC faculty members Dr. Vitetta named in her pleading or in her affidavits, including certain information about extramural funding they received or bridge funding UTSWMC provided them. We summarize this information here:

- ***Bruce Beutler, M.D.*** (information provided by Dr. Fitz)
  - Director of Center for Genetics of Host Defense, Regental Professor
  - His Center houses approximately 70 faculty, staff, and trainees
  - Extramural funding of $29 million to support research, lab

- ***Igor Butovich, Ph.D.*** (information provided by Dr. Thiele)
  - Associate Professor in Ophthalmology
  - $95,192 in bridge funding received from 3/1/15 to 7/31/16 from dept.

–20–

- ***David Farrar, Ph.D.*** (information provided by Dr. Thiele)
  - Director of Flow Cytometry Core
  - Associate Professor in Immunology
  - $150,000 in bridge funding approved 6/11/2015

- ***Lora Hooper, Ph.D.*** (information provided by Dr. Fitz)
  - Chair, Department of Immunology
  - Her own lab houses 18 researchers
  - Extramural funding of $4 million to support research, lab

- ***Rafael Ufret-Vincenty, M.D.*** (information provided by Dr. Thiele)
  - Associate Professor in Ophthalmology
  - $326,440 in bridge funding from 9/1/2017 through FY2019

- ***Ellen S. Vitetta, M.D.*** (information provided by Dr. Fitz)
  - Was Director of Cancer Immunobiology Center 1988-2013
  - Full Professor with tenure in Dept. of Immunology
  - Extramural funding of $871,000 to support research, lab

In their affidavits, Dr. Fitz and Dr. Thiele also provided information about UTSWMC's lab space allocations. Both stated UTSWMC allocates and reallocates research space based on the standards and best practices set forth by the American Association of Medical Colleges standards, which are included in the record.

Both men stated this involves "a data-driven utilization review . . . using an established financial model" and consideration of "institutional priorities and goals, underutilization of space, research productivity, and indirect and direct research dollars per square foot." Dr. Thiele provided certain details about how much money Dr. Vitetta and others had recovered in direct and indirect research expenditures per square foot over certain time periods and stated that in fiscal years 2014 to 2018, all of the extramural funding Dr. Vitetta obtained to cover her direct and indirect

research expenditures, regardless of source, was used to calculate her research space allocation. Dr. Fitz stated UTSWMC's lab space allocation for Dr. Vitetta was consistent with its established standards.

Dr. Thiele stated, "In making space allocation decisions, all extramural funding a faculty member has obtained is used to calculate research dollars per square foot, including federal or state grants, private foundation grants, consortium agreements with other research institutions, sponsored research agreements, or other sponsored programs, so long as the funds are actually spent on research activities."

Dr. Fitz stated that the lab and office space for Dr. Beutler, Dr. Hooper, and Dr. Vitetta "is commensurate in research dollars per square foot with extramural funding levels in accordance with UTSWMC's standards."

### b. Dr. Vitetta's Evidence

#### 1) Results and Statements in February 2015 Review

In 2014, Dr. Fitz informed Dr. Vitetta that her first post-tenure review would be due in February 2015. She had been tenured since 1974 and had never before received such a review.

In late February 2015, Dr. Vitetta's supervisor, Dr. Wakeland, provided Dr. Fitz with a post-tenure review letter about Dr. Vitetta, stating she "has had a stellar career spanning close to 45 years as a faculty member" and agreeing with the

"meets expectations" rating of her by the departmental review panel[19] for the 2010-2014 review period.

The review letter also referred to Dr. Vitetta's retirement, stating, "Dr. Vitetta is a senior faculty member who is nearing the point of retirement and, presumably, will transition to the status of Emeritus Professor." The letter also stated, "Should the single SRA that funds her research end without the acquisition of other sources of external funding, Dr. Vitetta will lose her laboratory space and lab staff."

At the end of the letter, Dr. Wakeland stated he "would like to develop a strategy that will facilitate the transition of Dr. Vitetta to Emeritus Professor at an appropriate time" and would "continue to strive to find a process that will allow this transition to proceed gracefully." Dr. Vitetta had no intention of retiring and was in no hurry to become an Emeritus at that time.

Just over three months later, UTSWMC sent Dr. Vitetta its June 4 and June 9, 2015 letters, informing her salary had been cut by $50,000 per year and that she would be losing her research lab and lab staff by August 31, 2015.

### 2) Salary and Lab Cuts and Comments by Dr. Wakeland

When Dr. Vitetta received Dr. Wakeland's June 9, 2015 letter stating that lab space would no longer be available after August 31, 2015, Dr. Vitetta was then in

---

[19] The letter indicated that the departmental review committee consisted of Dr. Lora Hooper, Dr. Jerry Niederkorn, and Dr. Chandrashekhar Pasare.

the process of negotiating the renewal of the Enterprise Mimetics SRA. According to her affidavit, losing the lab space would likely cause the SRA not to be renewed.

She requested and was granted a storage lab to keep all her equipment and reagents[20] until she heard about her pending grant. Dr. Vitetta filed a formal grievance with UTSWMC's president in early August, and he granted her a one month extension. She met several times with her supervisor, Dr. Wakeland, to discuss the cuts to her lab. In describing these discussions, she stated, in part:

> In short, Dr. Russell[21] wanted to turn my lab over to Dr. Lora Hooper (a woman twenty-two years my junior . . . [who] had lab space . . . . I informed Dr. Wakeland that I had heard a rumor that Dr. Russell had previously been heard saying that senior scientists "should buy a fishing pole," and he confirmed that Drs. Fitz and Russell both wanted me to retire as soon as possible but recognized that they could not force me to do so. He also noted that they wanted my Endowments back and that this would occur if I retired. My interpretation of all this was that they were doing everything in their power to harass me until I simply quit.

As to her salary cut, Dr. Wakeland told Dr. Vitetta he had informed Dr. Fitz and Dr. Russell that she had been supporting her lab through her sponsored research agreement with Enterprise Mimetics, which brought in more money than many senior professors, but, Dr. Russell said he "did not care"—this was "not peer reviewed money and did not count."

---

[20] Dr. Vitetta describes a reagent as a substance or mixture for use in lab research that is often the result of twenty to twenty-five years of continuous research.

[21] Dr. Russell and Dr. Fitz were both Deans, with Dr. Russell reporting to Dr. Fitz. Their specific positions are described below.

Dr. Vitetta had never before been told during her years at UTSWMC that peer-reviewed and non-peer-reviewed money were counted differently. In their discussion about this, Dr. Wakeland told Dr. Vitetta, "They probably made that up." Dr. Wakeland indicated "he had never heard of it before" and had spoken about this to Dr. Norgard, the Chair of the Immunology Department, and Dr. Norgard "had never heard of any such rule either." Dr. Wakeland reiterated that "the notion that [she] needed peer-reviewed funding was probably a 'newly made up rule.'" Dr. Vitetta and Dr. Wakeland "agreed that many clinical faculty run their labs on [sponsored research agreements]," and he indicated he thought "this was a poor excuse for cutting [her] salary."

Dr. Vitetta donated her personal share of certain royalties to UTSWMC in a check earmarked toward lab expenses. On August 11, 2015, she learned that the UTSWMC president's office had ordered that the check be held and not deposited until further notice, even though her lab funds were running low and she needed to pay salaries. The check was eventually deposited.

On August 26, 2015, Dr. Vitetta met again with Dr. Wakeland to discuss her salary cut and temporary storage lab. Dr. Vitetta's affidavit states that in their discussion, "Dr. Wakeland and I agreed that the real reason all of this was happening to me was that the Deans—Fitz and Russell—wanted me to retire and would push me until I did."

Dr. Wakeland told her if he were in her position, he would retire. She told him she did not wish to, and when he seemed puzzled, she explained her work was important to her and she wanted to finish it. Dr. Vitetta pointed out that their department had three other empty labs, and Dr. Wakeland told her he preferred she not occupy them even if she did get more funding, since they were being held for "new junior recruits" who were not yet identified. Two of these three labs were later occupied by other UTSWMC faculty members, both men, one in his thirties, and one in his forties.

Dr. Vitetta stated in her affidavit, "Dr. Wakeland told me that Dr. Russell was determined 'to get me out' and 'clear the decks for new people' . . . . [and that] 'they all' (Fitz, Russell, Podolsky) wanted me gone, or at least in an Emeritus position without a lab or my endowed chairs."

Dr. Vitetta spent most of September and October 2015 trying to find ways to hold on to her storage lab space and her five remaining staff members. Around October 1, 2015, she received a $100,000 materials transfer agreement with a company named Soligenix, and she signed over her $50,000 share to UTSWMC for her lab. On October 29, 2015, she emailed Dr. Fitz, demonstrating that her lab now had sufficient funding through January 31, 2016, and she asked that reduction-in-force notifications be delayed until December 1, 2015, which would allow staff to remain employed until January 31, 2016, due to the two-month notice UTSWMC was to provide. UTSWMC replied, stating it would not wait, and UTSWMC sent

reduction-in-force notification letters to her staff that same day, informing them on October 29 their employment would be terminated effective December 31, 2015.

On November 3, 2015, Dr. Vitetta met again with Dr. Wakeland to discuss her salary cut, lab, equipment, and termination of her staff, even though she had money set aside to cover the cost of staff salaries. In her affidavit, Dr. Vitetta states, "In the context of this conversation, Dr. Wakeland informed me that it would be very difficult for him to accommodate me because if he did he would get a lot of flak from a lot of people in the administration, because they had already communicated to him that their objective was that they wanted me to retire."

On or around December 9, 2015, she informed UTSWMC of her intention to use her lab's money to retain her staff as "temps" (i.e. independent contractors) through the end of January. By that point, no lab money would have been available but for the personal donations she had made, including the $50,000 for the Soligenix money she had donated. Two days later, on December 11, 2015, a lawyer with UTSWMC emailed her, copying Dr. Podolsky and Dr. Fitz, stating that UTSWMC intended to give Soligenix a $50,000 refund, even though Soligenix had made no such request. Dr. Vitetta protested, but UTSWMC withdrew $25,000 from her lab account and sent it to Soligenix. While Soligenix later returned the money, her lab was crippled. By the end of January, 2016, all of her staff, save one, had left.

In February 2016, Dr. Vitetta received news that her last pending grant would be funded, but by this time, her lab had been completely decimated, and all

–27–

remaining items were in a storage lab in the pathology department. By May 2016, Dr. Vitetta had to start all over building a lab team, reorganizing the lab, and moving more things into storage to make room to work. Now that she was funded, she requested lab space back in the immunology department, and her request was denied. UTSWMC gave her a storage lab in pathology to use as her "permanent" lab space, and she trained two new lab employees. Having a lab in pathology while holding an appointment in immunology is very difficult, and at least once, Dr. Vitetta had to move within pathology to accommodate one of the department's new recruits, again losing time.

According to her affidavit, because the lab space UTSWMC told Dr. Vitetta to vacate in June 2015 remained empty for nine months, Dr. Vitetta concluded that Dr. Russell and Dr. Fitz directed Dr. Wakeland to throw her out of her lab space on August 31, 2015 "for the sole purpose of killing my SRA funding and further pushing me to retire."

When she and Dr. Wakeland met to discuss her situation on December 15, 2015, Dr. Wakeland informed her that the administration was "inconsistent" in the way it was defining what money "counted" and what did not. He said he had discussed the administration's pattern of defining and re-defining what constituted sufficient funding in their department, and the other department chairs stated they "had never heard of such a thing" and "had no idea what the administration was talking about" with regard to funds from sponsored research agreements as opposed

–28–

to NIH grants.  Dr. Vitetta replied that it "appeared to be made up" on the spot, and Dr. Wakeland agreed.  He also told her it appeared to him that the administration was cycling department chairs out after age sixty-five.

### 3) Dr. Vitetta's Unique Status, Her Comparison to Others, and Views from Other Faculty

In her affidavit, Dr. Vitetta stated she holds a unique position among faculty at UTSWMC in three respects:  she is the only faculty member at UTSWMC who has accomplished both widespread recognition for both teaching and scientific excellence and productivity; she is the only faculty member at UTSWMC whose graduate student has gone on to win the Nobel Prize; and she has one of the most extensive publication records of any member of the UTSWMC faculty.  Dr. Vitetta stated that between her "accomplishments and recognition in teaching and science, as well as the tens of millions of dollars . . .  raised" for UTSWMC, there is no employee at UTSWMC who is similarly situated to her.

However, Dr. Vitetta also stated that while there is no employee at UTSWMC similarly situated to her in both teaching and research, both Dr. Lora Hooper and Dr. Bruce Beutler were treated more favorably than she was, as they had not had their salaries cut, had not had their research and productivity compromised, aggressively undermined, and actively sabotaged as hers had been, and had not been subjected to ill-defined and constantly changing fund-raising rules. Dr. Vitetta also stated that "younger faculty members in their thirties and fifties have received more

favorable treatment—most of them men." She named three such individuals: Dr. David Farrar, Igor Butovich, Ph.D., and Rafael Ufret-Vincenty, M.D., and she stated that they are younger, less-qualified men UTSWMC treated more favorably with regard to bridge funding.

Dr. Wakeland discussed Dr. Farrar with Dr. Vitetta on May 5, 2016. Dr. Farrar is a male in his fifties who was not a full professor. He is a tenured associate professor in the Immunology and Molecular Biology Departments in the Basic Sciences Division, where Dr. Vitetta is. In their discussion, Dr. Wakeland informed Dr. Vitetta that Dr. Farrar was without grant money but was being allowed to remain in a 2,400 square foot lab, more than double what she had. Dr. Wakeland had also been helping Dr. Farrar with his salary and operating funds for a while.

Dr. Butovich and Dr. Ufret-Vincenty are male UTSWMC faculty members in their early fifties. Dr. Niederkorn, who chairs their department and is very familiar with their employment with UTSWMC and with Dr. Vitetta's, identified both Dr. Butovich and Dr. Ufret-Vincenty as "two less qualified and younger male research faculty members" whom UTSWMC "recently treated more favorably" than UTSWMC treated Dr. Vitetta with regard to research bridge funding.[22]

---

[22] At the time of his 2018 affidavit, Dr. Niederkorn was UTSWMC's former director and then-current Vice Chairman of Research for the Department of Ophthalmology. In his affidavit, he identified Dr. Butovich and Dr. Ufret-Vincenty as Associate Professors at UTSWMC. He also indicated he had been a UTSWMC colleague of Dr. Vitetta's for over thirty-five years and is "very familiar with her career and track record as an immunologist and research scientist."

Dr. Niederkorn described Dr. Vitetta's qualifications and accomplishments as "better" than those of Dr. Butovich or Dr. Ufret-Vincenty and stated Dr. Vitetta has "contributed substantially more to her fields than either of them had thus far contributed to theirs."[23] He described Dr. Vitetta as "one of the most accomplished immunologists and microbiologists in the world."

Dr. Niederkorn stated that when Dr. Butovich was unable to obtain grant money to fund his research in approximately 2014-2016, UTSWMC provided Dr. Butovich bridge funding for at least two years that paid his entire salary, covered the cost of his lab space and salaries of his research personnel, and kept his lab running during a lengthy gap in available funding for his research.

Dr. Niederkorn also stated that when Dr. Ufret-Vincenty was unable to obtain grant funding from approximately 2015 through at least June 30, 2018, UTSWMC provided him bridge funding to cover the cost of his lab space and the salaries of his personnel.

Finally, Dr. Niederkorn stated that UTSWMC provided funding to Dr. Butovich and Dr. Ufret-Vincenty from "discretionary portions of the department's budget, without the Dean's or University's having tied the department chair's hands with respect to any bridge funding the department provided," and that the dean and

---

[23] Among other positive statements describing Dr. Vitetta, Dr. Niederkorn stated she is "one of the most accomplished immunologists and microbiologists in the world" and that, while UTSWMC "has many fine scientists in many different fields, there are few whose careers have produced such distinction."

other members of UTSWMC "did not actively intervene to sabotage their efforts" in cobbling together a solution for funding gaps, such as "making unilateral decisions on sponsored research agreements or other private funding sources, removing funds from their lab's bank accounts without agreement, and terminating their lab personnel even when funding was available."

Dr. Niederkorn had been on the review panel for Dr. Vitetta's February 2015 review. Consistent with Dr. Wakeland's comments to Dr. Vitetta regarding funding, in Dr. Niederkorn's affidavit, he stated, "In the evaluation of a research professor's performance in the arena of fund raising for his or her own research, I am not aware of UTSW's refusing to acknowledge, accept or count non-peer-reviewed funding, private funding, sponsored research agreements, re-directed chair money, or funding from any other source the professor was able to obtain or divert."

According to Dr. Niederkorn, UTSWMC and Dr. Fitz "have never issued any written rule, regulation, standard or guideline limiting research faculty to NIH funding . . . to peer-reviewed funding . . . nor . . . has any such rule been orally communicated." In his experience, UTSWMC "and Dr. Fitz welcome financial contributions to scientific research from nearly any source the research faculty member can secure, and there is no written or orally communicated standard informing research faculty in advance that, without NIH funding in place, other sources of income or support will be rejected by the University."

In explaining why he provided an affidavit, Dr. Niederkorn stated, "I am greatly concerned that Dr. Vitetta's contributions and value to the University are not being recognized, and her continued success as a research scientist is being hampered."

### 4) Other Prior Events Affecting Dr. Vitetta[24]

Dr. Vitetta also provided evidence regarding UTSWMC's treatment of her in the years leading up to the 2015 cuts. She described serving as Director of the CIC for twenty-five years beginning in 1988, and she detailed the circumstances surrounding its closure, some of which we include here.

From 1998 to 2012, Dr. Vitetta was "never given any specific parameters for the funds she had to raise" for the CIC—including "no specific minimums to raise, no specific sources where any such funds had to come from (e.g. peer-reviewed or otherwise), and no specific requirements for the allocation of such funds (e.g., for her salary, lab expenses, or otherwise)."

Between 2008 and 2011 (not long after Dr. Vitetta turned sixty-five), UTSWMC placed into executive or senior leadership positions three male doctors who are ten to fifteen years younger than she is, including Daniel K. Podolsky, M.D.,

---

[24] Though not actionable here, events before June 2015 may serve as relevant background evidence in this appeal. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (acts not made the basis for a timely charge may constitute relevant background evidence in which the status of a current practice is at issue); *McDonnell Douglas*, 411 U.S. at 804 (other evidence that may be relevant to any showing of pretext includes facts as to the employer's treatment of the employee during the employee's prior term).

Greg Fitz, Ph.D., and David Russell, Ph.D., who joined UTSWMC in 2008, 2009, and 2011, respectively.[25]

On May 1, 2012 (about a month before her seventieth birthday), Dr. Russell met with Dr. Vitetta and told her he intended to "shut down her good manufacturing practice lab" and to give the lab space to a newly hired faculty member, Bruce Beutler, M.D., a man approximately fifteen years younger than she is. When she told Dr. Russell this would undermine her research and the productivity of the CIC, he "became angry and began to disparage her, her work, and her research program." Dr. Vitetta told Dr. Russell that she needed that lab to continue doing clinical trials, that it "was the centerpiece of her entire research operation in the CIC," and she "could not manufacture a vaccine or anything else for human use without it." Despite her objections, UTSWMC and Dr. Russell followed through with the plan.

Between May 2012 and March 2014 (as Dr. Vitetta approached seventy-two), the CIC's floor space went through constant renovations and moves. Dr. Vitetta's group was repeatedly relocated to various parts of the floor. Equipment, office records, reagents, freezers, refrigerators, and everything else the lab used had to be moved each time. During this time, the CIC's personnel, productivity, research projects, and acquisition of data were all severely compromised by persistent

---

[25] During relevant times here, Dr. Podolsky was UTSWMC's president, Dr. Fitz was UTSWMC's Executive Vice President for Academic Affairs and Provost, Dean of UT Southwestern Medical School, and Dr. Russell was UTSWMC's Vice Provost and Dean of Basic Research and worked under Dr. Fitz.

construction, renovations and moves made to accommodate Dr. Beutler's new center. These functions slowed down and often stopped research, and personnel could not work because of noise, contamination with dust and mold, and overall loss of morale or inability to concentrate.

During this time, as Dr. Beutler was gradually given more and more space, Dr. Vitetta's space was cut back, and eventually, Dr. Beutler took over the space for his own. Dr. Vitetta's lab productivity was severely hindered by two years of constant moving and construction. She brought these concerns to her superiors and was either ignored or rebuffed.

This disruption and lack of support created chaos that made the CIC unable to provide new data or publications, and Dr. Vitetta's attempts to land a new NIH grant were largely unsuccessful during that period as a result of the chaos. When her grant funds began to run out and new grants were not yet successful, Dr. Vitetta was told for the first time that she had to close the CIC because she had not raised enough funds in the prior years. This created an enormous and entirely new disruption to her research, as the closure led to, among other things, the relocation or destruction of records and the move or loss of valuable chemical reagents and irreplaceable animal and human serum samples. Closure also resulted in the firing of thirty-five of her forty employees, many of whom had worked for her for ten to twenty years.

Around March 2014, Dr. Vitetta spoke with Dr. Wakeland, who chaired the Department of Immunology, and Dr. Norgard, who chaired the Department of

–35–

Microbiology, about finding space to move her remaining group to since she was tenured in both departments. Dr. Wakeland told her she could have temporary space in immunology until he needed the space for "new young recruits," and Dr. Norgard told her he only had space for a "new recruit." The temporary space would only allow her 1,000 square feet (her CIC space was 18,000 square feet), leaving an extremely crowded working lab, with some equipment stored on other floors, in other buildings, with colleagues, and even in Dr. Vitetta's home.

Also in 2014, Dr. Fitz informed Dr. Vitetta that her first post-tenure review would be due in February 2015. She had been tenured since 1974 and had never before received such a review. The February 2015 post-tenure review letter Dr. Wakeland provided Dr. Fitz in connection with that review is described earlier. Just over three months after that letter, UTSWMC made the cuts to Dr. Vitetta's salary and lab that led to this lawsuit.

### 2. Analysis of Age and Sex Discrimination Claims

#### a. Adverse Action (Lab Cuts)

With regard to her discrimination claims involving her lab (but not her salary), UTSWMC argues the events in 2015 do not constitute an adverse action under *McDonnell Douglas*. UTSWMC characterizes her claim as one involving a "work space move" that is not actionable, and even if actionable, one that was not materially adverse. We disagree. Even if we assume UTSWMC satisfied its initial burden of negating this element with its own proof (which we doubt, based on this

–36–

record), Dr. Vitetta's evidence raises a genuine issue of fact on this jurisdictional element on her lab-related age and sex discrimination claims.

In reaching this conclusion, we have considered the TCHRA's plain text, which makes it an "unlawful employment practice" to "discriminate in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment." TEX. LAB. CODE § 21.051. At a minimum, a fact issue exists on whether her lab constituted a term, condition, or privilege of her employment and whether its removal was sufficiently adverse to constitute an adverse employment action for *McDonnell Douglas* purposes.

In addition to considering the statutory text, we have also considered the cases UTSWMC cites, *Allbritain v. Texas Dep't of Ins.*, No. A-12-CA-431-SS, 2014 WL 272223 (W.D. Tex. Jan. 23, 2014), *Hamlett v. Gonzales*, No. 3:03-CV-2202-BHM, 2005 WL 1500819 (N.D. Tex. June 15, 2005), *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568 (Tex. App.—Houston [14th Dist.] 2004, no pet.), and *Wooten v. St. Francis Med. Ctr.*, 108 F. App'x 888 (5th Cir. 2004) (unpublished). None of these cases are binding, and each is distinguishable from the facts here.

We begin with *Winters*, the only TCHRA case UTSWMC cites on this issue. UTSWMC cites *Winters* for the proposition that the TCHRA only addresses ultimate employment decisions, a phrase that is not contained in the TCHRA itself and that does not accurately describe the law. As indicated above and in the statute itself, among other things, the TCHRA prohibits employers from discriminating against an

–37–

individual "in connection with . . . the terms, conditions, or privileges of employment." TEX. LAB. CODE § 21.051(1).[26]

*Winters* involved facts distinguishable from those here and does not support UTSWMC's argument on the adverse action element. In *Winters*, an underwriter asserted a discriminatory constructive discharge claim based on his resignation after receiving performance warnings and after his underwriting authority was revoked and was not reinstated. *Winters*, 132 S.W.3d at 571–73, 575–76. The court concluded a fact issue existed on the adverse action element in that case but affirmed summary judgment based on other elements. *Id.* at 575–80.

UTSWMC also cites *Wooten*, 108 F. App'x at 891 and *Hamlett*, 2005 WL 1500819, at *15, but those cases are distinguishable as well. In *Wooten*, in an unpublished opinion and in dicta, the Fifth Circuit stated that the act of moving a claimant's work area to a storage closet did not constitute an adverse action. *Wooten*, 180 F. App'x at 891. The opinion is silent about what evidence the employee presented, if any, to show what impact the move had on the claimant's work or workplace conditions. In *Hamlett*, the court found that a change in office assignment did not constitute an adverse employment action and noted, in part, that the claimant

---

[26] *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) (interpreting similar language under Title VII as covering "actions that affect employment or alter the conditions of the workplace"); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–16 (2002) (scope of Title VII's prohibition is not limited to economic or tangible discrimination); *Alamo Heights*, 544 S.W.3d at 781 ("Texas jurisprudence parallels federal cases construing and applying equivalent federal statutes, like Title VII.").

had not asserted her pay, benefits, or level of responsibility changed as a result of the new location. *Hamlett*, 2005 WL 1500819, at *15. Unlike those cases, even if we assume UTSWMC's evidence negated this element, Dr. Vitetta has raised a genuine fact issue here considering the negative impact on her work and level of responsibility.

Finally, UTSWMC cites *Allbritain*, and argues the reduction-in-force of Dr. Vitetta's lab employees is not an adverse action. In *Allbritain*, the court determined that an employer's refusal to provide a claimant with support staff did not constitute an adverse action. 2014 WL 272223, at *8. Unlike that case, here UTSWMC closed her lab and removed her staff from their existing projects, thus negatively altering Dr. Vitetta's existing work conditions and level of responsibility.

In addition to UTSWMC's cited cases, we have also considered *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1125–26 (9th Cir. 2000), which involves facts more similar to those involved here. In *Chuang*, an assistant professor of pharmacology and an assistant research pharmacologist sued a state university for discrimination, based in part on the relocation of their lab space. *Id.* at 1119, 1125–26. The trial court granted summary judgment in the employer's favor. On appeal, the circuit court reversed the trial court's judgment on the claim involving the lab, concluding that "the relocation of their laboratory space unquestionably qualifies as an adverse employment action" and "involved far more than, as the district court characterized it, a 'host of annoyances.'" *Id.* at 1125–26. The court found that the

relocation of the lab in that case "more than qualified" as an adverse employment action, based in part on evidence that the forced relocation of the lab "disrupted important, ongoing research projects," after which the research team quit, experimental subjects were lost, and research grants were withheld. *Id.* In deciding that issue, the court held, "The removal of or substantial interference with work facilities important to the performance of the job constitutes a material change in the terms and conditions of a person's employment." *Id.*

Here, it is undisputed that UTSWMC informed Dr. Vitetta that by August 31, 2015, her lab space would no longer be available, her employees would be terminated through a reduction in force, she and her employees would be responsible for moving all equipment, supplies, and other items out of the space, and she would be responsible for all costs associated with doing so. In other words, UTSWMC informed her—a member of its research faculty—that she would no longer have a place, the personnel, the equipment, or the tools necessary to conduct her research.

We agree with *Chuang*'s analysis and conclude Dr. Vitetta's evidence raises a genuine issue of fact on the adverse action element of her lab-related age and sex discrimination claims.

### b.    Disparate Treatment (Salary and Lab Cuts)

UTSWMC also argues Dr. Vitetta is unable to satisfy the disparate treatment element of her prima facie case of age or sex discrimination because she cannot show that other similarly situated, "nearly identical" employees were treated more

favorably with regard to their lab or their salary. We conclude UTSWMC has satisfied its burden under *Alamo Heights* but also conclude that Dr. Vitetta has raised a fact issue on this element on both her lab- and salary-related discrimination claims.

First, "whether two employees are 'similarly situated' generally presents a question of fact for the jury." *Wallace v. Seton Family of Hosps.*, 777 F. App'x 83, 89 (5th Cir. 2019) (unpublished) (citing *Perez v. Tex. Dep't of Crim. Justice, Institutional Div.*, 395 F.3d 206, 214–15 (5th Cir. 2004); *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005)); *see Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

Second, rigidly applying the prima facie elements to require Dr. Vitetta to identify a "nearly identical" comparator to her would contradict the Supreme Court's statement in *Young* that the prima facie case does not require a plaintiff to show "that those whom the employer favored and those whom the employer disfavored were similar in all but the protected ways." *Young*, 575 U.S. at 228 (citing *McDonnell Douglas*, 411 U.S. at 802; *Furnco*, 438 U.S. at 575–77; *Burdine*, 450 U.S. at 253). Further, a rigid application of a "nearly identical" requirement would be contrary to *McDonnell Douglas* and its progeny when, as here, there is evidence that would allow us to infer, if UTSWMC's actions remain unexplained, that it is more likely

than not that its actions were based on Dr. Vitetta's age or sex. *See Young*, 575 U.S. at 228 (citing *Furnco*, 438 U.S. at 576).[27]

Third, *Alamo Heights* makes clear that employees are "similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." 544 S.W.3d at 791 (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)). Here, the evidence suggests that, at the time of the pertinent events, Dr. Vitetta and the other research faculty she lists as comparators were all in the same ultimate chain of command, where the decisions by their department chairs were overseen and supervised by Dr. Russell, Dr. Fitz, and Dr. Podolsky who served as senior leadership officials. According to the parties' evidence, at least two of these individuals, Dr. Russell and Dr. Fitz, played a role in shutting down Dr. Vitetta's labs (both before and in 2015), communicated with her supervisor about her funding, and left her supervisor with the impression that they all wanted Dr. Vitetta to retire but knew they could not force

---

[27] One scholar has noted that requiring comparator evidence in our modern economy can have the effect of restricting, rather than promoting, anti-discrimination laws given the realities of modern workplaces, particularly in cases involving high-level, specialized, and unique positions, including in academia, as well as those involving intersectional claims of discrimination (e.g. when the combination of two or more protected traits forms the basis for discrimination). Suzanne B. Goldberg, *Discrimination by Comparison*, 120 Yale L.J. 728, 731 (2011) (stating that the comparator heuristic "is barely functional in today's economy," is "largely unresponsive to updated understandings of discrimination," and has "constrict[ed] the very idea of discrimination"); *see* Tricia M. Beckles, *Class of One: Are Employment Discrimination Plaintiffs at an Insurmountable Disadvantage if They Have No "Similarly Situated" Comparators?*, 10 U. Pa. J. Bus. & Emp. L. 459, 469, 471 (2008) (describing various standards among the federal circuit courts on the issue, pointing out they are "by no means uniformly defined" and are "hardly a 'standard' in a strict sense," and stating the differences cause "a great deal of uncertainty" particularly in cases involving a "class of one").

her to do so.  Additionally, UTSWMC's own evidence indicates that at all pertinent times here, Dr. Fitz was responsible for overseeing all academic affairs, including "faculty appointments, faculty salaries, faculty performance and research productivity, and allocation of research and academic space," the very actions that are at issue.  Based on the evidence before us, we believe Dr. Vitetta has raised a genuine fact issue on whether the comparators she has identified are similar to her in all material respects as required by *Alamo Heights*.

Thus, a fact-finder could infer that Dr. Vitetta's age and sex were motivating factors in UTSWMC's decisions to cut her salary and lab in 2015.  After several decades of successful employment, UTSWMC's actions toward Dr. Vitetta as she approached and surpassed age seventy worsened and increased in intensity over time, culminating in a significant salary reduction and loss of her research lab and lab staff.  The June 2015 events at issue occurred roughly three months after her supervisor communicated to Dr. Fitz about her then-unplanned retirement and his hope for a smooth process to transition her to Emeritus status.  Dr. Vitetta's evidence shows that beginning in June 2015 and in the months thereafter, UTSWMC removed lab space from Dr. Vitetta and gave it to younger faculty members, denied her use of other, available space that her supervisor indicated was being reserved for newer, younger recruits, provided to two younger men two of the available spaces she had been denied, and interfered with her funding efforts in ways that younger and male

faculty members did not experience, according to Dr. Vitetta, her supervisor, and Dr. Niederkorn.

We conclude Dr. Vitetta has raised a genuine fact issue on the disparate treatment elements of her age and sex discrimination claims involving both her salary and her lab.

### c.      Pretext (Salary and Lab Cuts)

UTSWMC argues that Dr. Vitetta cannot show that its reasons for cutting her salary and lab in 2015 were a pretext for age or sex discrimination. While UTSWMC has satisfied its burden under *Alamo Heights*, Dr. Vitetta has raised a fact issue on this element on both her lab- and salary-related discrimination claims.

Under *McDonnell Douglas*, once an employer produces a legitimate, nondiscriminatory explanation for its decision, an employee "must be afforded 'the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253). An employee can do this by showing that the employer's proffered reason is "unworthy of credence." *Id.* (quoting *Burdine*, 450 U.S. at 256); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) ("An explanation is false or unworthy of credence if it is not the real reason for the adverse employment action."). Along with prima facie proof, disbelief of the reason put forward by the employer may "suffice to show intentional discrimination" and

"will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.'"

*Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). *Reeves* states, "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Id*.

> In *Michael v. City of Dallas*, we described the TCHRA analysis this way:
>
> If the defendant proffers a legitimate reason for the adverse employment decision, the burden shifts back to the plaintiff to show either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ('mixed motive').

314 S.W.3d at 691 (citing *Rachid v. Jack in the Box, Inc*., 376 F.3d 305, 312 (5th Cir. 2004); *McCoy v. Texas Instruments, Inc*., 183 S.W.3d 548 (Tex. App.—Dallas 2006, no pet.)).

Here, UTSWMC makes two main arguments regarding pretext, one regarding falsity, and the other, regarding whether we may consider certain evidence.

As to its first argument regarding falsity, UTSWMC argues that Dr. Vitetta cannot demonstrate pretext when she has not presented any evidence contradicting its assertions regarding certain funding issues—arguing, in essence, that funding issues are why the 2015 cuts to the lab occurred. With regard to her salary cut, UTSWMC states, "[Dr.] Vitetta's salary was reduced because of her sustained lack of grant funding and because at [her prior salary amount] annually, her salary was

–45–

72% higher than similarly situated Basic Sciences faculty." This statement is consistent with the reason Dr. Fitz provided in his 2017 affidavit, but notably, it provides an additional reason beyond the reason UTSWMC provided her in 2015, when UTSWMC stated her salary cut was "due to the sustained absence of external grant support" and did not discuss how her salary compared with others.

With regard to the cuts to her lab and lab staff, UTSWMC states that Dr. Vitetta has failed to put forth any evidence that its "financial and business reasons" for making the lab cuts are false and mere pretext for discrimination or retaliation because "her own evidence establishes her lack of extramural funding during the period," and UTSWMC then mentions other facts, including that her allocation of lab space is consistent with UTSWMC's standards and is nearly identical to others. However, notably missing from UTSWMC's pretext discussion in its brief is any acknowledgment that the funding-related reasons it now asserts were never mentioned in its June 9, 2015 letter notifying her of the lab cuts. Instead, that letter simply informed her that, "The space is required for other departmental needs."

Regardless of the precise reasons for UTSWMC's actions, we reject UTSWMC's first argument because, even if its asserted reasons are true, an unlawful employment practice may still be established under the TCHRA if Dr. Vitetta's age or sex were motivating factors in the decisions to cut her salary or lab staff. *See* TEX. LAB. CODE § 21.125(a). Additionally, even if UTSWMC's reasons appear facially

–46–

true, a fact-finder could conclude from Dr. Vitetta's evidence that UTSWMC's asserted reasons were "made up," were a "poor excuse," and were not the "real reason" UTSWMC made the cuts to her salary and lab in 2015. Because of this evidence, a fact-finder could also infer from her evidence that UTSWMC made these cuts due to her age and her sex. *See Reeves*, 530 U.S. at 147.

Under *Reeves*, a fact-finder may infer that discrimination has occurred if the plaintiff can demonstrate the employer's reason is "unworthy of credence." *Id.* ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). Doubt in the employer's asserted reason can be established in a number of ways, including by proof that the employer provided shifting or different reasons for its action at different times. *See Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) ("employer's inconsistent explanations for an employment decision 'cast doubt' on the truthfulness of their explanations"); *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 575 (5th Cir. 2003) (jury could infer discriminatory animus from employer's shifting reasons from time of the adverse employment action to time case was litigated). Doubt can also be established when the reason seems to make no sense. *See Young*, 575 U.S. at 233 (Alito, J., concurring) ("when an employer claims to have made a decision for a reason that does not seem to make sense, a factfinder *may* infer that the employer's asserted reason for its action is a pretext for unlawful discrimination"). Here, particularly in

–47–

light of the contents of the February 2015 post-tenure review letter, which notes Dr. Vitetta's considerable contributions to UTSWMC and her "meets expectations" rating for the prior review period of 2010 to 2014, subjecting her to such significant cuts just over three months later makes no sense. Even without considering Dr. Wakeland's comments (which we will separately address below), Dr. Vitetta's other evidence, including her post-tenure review letter, her own history at UTSWMC, and her evidence from Dr. Niederkorn, are sufficient to raise a genuine fact issue on pretext.

Dr. Vitetta's pretext evidence is even stronger when we consider the comments made by Dr. Wakeland, her supervisor, regarding the cuts. This brings us to UTSWMC's second argument regarding pretext, in which UTSWMC asserts we should ignore evidence of Dr. Wakeland's comments because they "are not direct evidence of discrimination or discriminatory animus sufficient to allege a violation of the TCHRA."[28]

Dr. Vitetta does not argue Dr. Wakeland's comments are direct evidence, but instead offers them as evidence of pretext. At oral argument, in response to a question about how the court should view Dr. Wakefield's comments, UTSWMC's counsel took the remarkable position that, because they do not constitute direct

---

[28] UTSWMC describes Dr. Wakeland's comments as "hearsay, rumors, and stray comments." Although UTSWMC made similar arguments below, the record contains no specific objections by UTSWMC or rulings by the trial court on such matters. Thus, UTSWMC did not preserve any hearsay-related objections for our review, and we do not consider such objections here. *See* TEX. R. APP. P. 33.1.

evidence, they simply do not count as any evidence at all. We disagree. Dr. Wakeland's comments are strong circumstantial evidence that UTSWMC's reasons for the 2015 cuts to her salary and lab were unworthy of credence and would allow a fact-finder to infer that Dr. Vitetta's age and sex were both motivating factors in UTSWMC's decisions. *See Reeves*, 530 U.S. at 147. Ignoring or minimizing such evidence would be inconsistent with *Reeves*, 530 U.S. at 152–53, with our standard of review here, and with the rules of evidence, which make no distinction between direct and circumstantial evidence.

In *Reeves*, a jury concluded that an employee was terminated because of his age in violation of section 623(a)(1) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–34, based in part on two age-related comments by a person who participated in the decision to terminate him—comments made several months before the firing that the employee "was so old that he 'must have come over on the Mayflower,'" and "was 'too damn old to do the job.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 197 F.3d 688, 691 (5th Cir. 1999), *rev'd*, 530 U.S. 133 (2000). After the verdict, the trial court denied the employer's motion for judgment as a matter of law, and on appeal, the Fifth Circuit reversed, finding there was insufficient evidence of age discrimination to support the jury's finding of liability. *Id.* The Supreme Court reversed, criticizing the Fifth Circuit's dismissive treatment of the comments, stating:

In holding the record contained insufficient evidence to sustain the jury's verdict, the Court of Appeals misapplied the standard of review dictated by Rule 50. Again, the court disregarded critical evidence favorable to petitioner—namely, the evidence supporting petitioner's prima facie case and undermining respondent's nondiscriminatory explanation. The court also failed to draw all reasonable inferences in favor of petitioner. For instance, while acknowledging "the potentially damning nature" of [the speaker's] age-related comments, the court discounted them on the ground that they "were not made in the direct context of Reeves's termination." And the court discredited petitioner's evidence that [the speaker] was the actual decisionmaker by giving weight to the fact that there was "no evidence to suggest that any of the other decision makers were motivated by age." Moreover, the other evidence on which the court relied—that [other employees] were also cited for poor recordkeeping [the same reason the employer cited for firing Reeves], and that respondent employed many managers over age 50—although relevant, is certainly not dispositive. In concluding that . . . no rational trier of fact could have found that petitioner was fired because of his age, the Court of Appeals impermissibly substituted its judgment concerning the weight of the evidence for the jury's.

*Reeves*, 530 U.S. at 152–53 (quoting Fifth Circuit's opinion at 197 F.3d. at 693–94; internal citations omitted).

Later, in *Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000), the court noted such comments can be used to support discrimination and pretext, explaining that their value depends on the content of the remarks and the speaker. *Id*. at 225 (citing *Reeves*, 530 U.S. at 151–52). The court emphasized the importance of "view[ing] cautiously" its pre-*Reeves* stray remarks jurisprudence and also noted the court's prior warning that "'the 'stray remark' jurisprudence is itself inconsistent with the deference appellate courts traditionally allow juries regarding their view of

–50–

the evidence presented and so should be narrowly cabined.'" *Russell*, 235 F.3d at 225 (quoting *Vance v. Union Planters Corp.*, 209 F.3d 438, 442 n.4 (5th Cir. 2000)).

Finally, in *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012), the court explained that, unlike in a direct evidence case, where a more stringent four-part test applies,[29] when a plaintiff offers comments as circumstantial evidence alongside other discriminatory conduct, a more flexible, two-part test applies, requiring only that the comment show (1) discriminatory animus (2) on the part of a person primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decision maker. *Id*. at 441 (citing *Russell*, 235 F.3d at 226 and *Laxton*, 333 F.3d at 572). Here, the comments were made by Dr. Vitetta's supervisor in their discussions about her salary and lab cuts, and many of them reflect age-related motivations on the part of Dr. Russell, Dr. Fitz, and others in senior leadership positions with leverage over him.

Thus, in line with *Reeves* and our own analogous standard of review here,[30] we reject UTSWMC's assertion that we should ignore Dr. Wakefield's comments in

---

[29] Statements or remarks are direct evidence of discrimination when they (1) are related to the employee's protected class, (2) are related to the employment decision at issue, (3) are close in time to that decision, and (4) are made by an individual with authority over the decision. *See Dallas Indep. Sch. Dist. v. Allen*, No. 05–16–00537–CV, 2016 WL 7405781, at *7 (Tex. App.—Dallas Dec. 22, 2016, pet. denied) (mem. op.). Because neither party argues this is a direct evidence case, we do not apply that four-part test here. *See Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015) (citing *Reed*, 701 F.3d at 441).

[30] *Reeves* involved a motion for a judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, which mirrors the Rule 56 standard for summary judgment. Under both rules, courts must review all of the evidence in the record, drawing all reasonable inferences in favor of the non-movant, but making no credibility determinations or weighing any evidence. *Reeves*, 530 U.S. at 150.

considering Dr. Vitetta's claims. Both with and without consideration of Dr. Wakefield's comments, a fact-finder could conclude that UTSWMC's asserted reasons for Dr. Vitetta's salary and lab cuts were unworthy of credence, which alone and with the other evidence presented would allow a fact-finder to infer that Dr. Vitetta's age and sex motivated its decisions.

Because Dr. Vitetta has raised a genuine fact issue on her age and sex discrimination claims regarding her salary and lab cuts, we agree with the trial court that sovereign immunity under the TCHRA has been waived. *See Alamo Heights*, 544 S.W.3d at 785 ("Whether by jurisdictional plea or summary-judgment motion, the plaintiff is not put to the ultimate burden of proof but must only raise a fact issue on the existence of illegal intent.").

We overrule UTSWMC's second and third issues.

## C. Retaliation in Lab Cuts

In its first issue, UTSWMC argues, in part, that the trial court erred in denying its plea to the jurisdiction on Dr. Vitetta's lab-related retaliation claim. According to its counsel's statements in oral argument, unlike its other challenges, UTSWMC challenges Dr. Vitetta's claim on the basis of Dr. Vitetta's pleadings, not on its own evidence. In its briefing, UTSWMC challenges the adverse action, causal

connection, and pretext elements of her case. We agree with UTSWMC's argument regarding the causal connection element and do not reach its other arguments.[31]

### 1. UTSWMC's Position on Causal Connection

UTSWMC argues Dr. Vitetta's pleadings establish that no causal connection exists between her protected activity and UTSWMC's decision regarding her lab because the earliest protected activity she identifies in her pleading occurred on July 23, 2015, more than a month after UTSWMC had already made and communicated its decision regarding Dr. Vitetta's lab.

### 2. Dr. Vitetta's Pleading[32]

Dr. Vitetta's lab-related retaliation claim concerns the events that began on June 9, 2015, when UTSWMC informed her of the lab cuts. In her third amended petition, Dr. Vitetta states she "voiced her allegation of discrimination as early as July 23, 2015, in an e-mail to one of her superiors." She also states:

> The elements of a prima facie case of retaliation are: (1) that Plaintiff engaged in an activity protected by the TCHRA (such as Plaintiff's internal grievances of age discrimination on August 4, 2015 and November 4, 2015, and a charge of age and gender discrimination with TWC on November 30, 2015); (2) an adverse employment action occurred (here, (a) following through on the plan to deny Plaintiff's lab

---

[31] We do not reach UTSWMC's argument regarding adverse action or pretext, as they are not necessary to the final disposition of the appeal. *See* TEX. R. APP. P. 47.1.

[32] In her affidavit, Dr. Vitetta also states she filed internal complaints of age and gender discrimination with UTSWMC "during the summer and fall of 2015," filed a formal charge questionnaire with the Texas Workforce Civil Rights Division alleging age discrimination, gender discrimination, and retaliation "on November 30, 2015," and filed this lawsuit alleging age and gender discrimination and retaliation "on July 29, 2016." Neither her pleading nor her affidavit include any allegation of any protected activity before June 9, 2015, the date UTSWMC communicated its decision regarding the cuts to her lab and lab staff.

space and RIF Plaintiff's employees as events changed . . . and (3) a causal link existed between the protected activity and the adverse action . . . .

Because UTSWMC has challenged the pleadings on this claim, rather than the existence of jurisdictional facts, our task is to determine if Dr. Vitetta has alleged facts affirmatively demonstrating subject-matter jurisdiction. *Alamo Heights*, 544 S.W.3d at 770–71. She has not done so based on her pleadings here.

Dr. Vitetta complains about the events involving her lab that began on June 9, 2015, and describes the adverse action as UTSWMC "following through" on its plan to deny her lab space and to terminate her employees "as events changed." However, she cannot demonstrate a causal connection under the circumstances, when UTSWMC's decision regarding her lab cuts had been made and communicated to her before she engaged in any protected activity.

On these facts, Dr. Vitetta is unable to establish a causal connection between her protected activity and UTSWMC's cuts to her lab. *See Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (proceeding with a previously made decision after discovering protected activity has occurred is not evidence of causality for purposes of a retaliation claim; employers "need not suspend" such previously made decisions); *Alamo Heights*, 544 S.W.3d at 790 n.142 (citing *Breeden*, 532 U.S. at 272).

We sustain UTSWMC's first issue on Dr. Vitetta's lab-related retaliation claim and dismiss that claim for lack of jurisdiction.

**D.      Retaliation in Faculty Senate Role**

In her other retaliation claim, Dr. Vitetta alleges that UTSWMC retaliated against her by sabotaging her service and position as president of UTSWMC's Faculty Senate in 2018.  UTSWMC challenges the adverse action and causal connection requirements of her prima facie case.  We conclude UTSWMC has satisfied its burden under *Alamo Heights* but also conclude that Dr. Vitetta has raised a fact issue on these elements on this claim.

**1.      The Parties' Evidence**

**a.      UTSWMC's Evidence**

Dr. Vitetta asserts in this lawsuit that UTSWMC retaliated against her for her complaints of age and sex discrimination by sabotaging her role as president-elect of UTSWMC's Faculty Senate, a group whose function and purposes are explained in the evidence Dr. Vitetta provided, which we discuss in the next section.

UTSWMC denies any involvement in this, and in connection with its plea, UTSWMC submitted affidavits from three of its faculty members, Dr. Linda Hynan, Dr. Jeffrey Van Dermark, and Dr. Yan Peng, each of whom served as president of the Faculty Senate for one year in the period from 2015 to 2018, respectively.

Dr. Van Dermark stated he "became aware that then president-elect of the Faculty Senate, Dr. Ellen Vitetta, had a pending lawsuit against" UTSWMC.  He "discovered this information on [his] own via public records," and "[n]o member of [UTSWMC's] administration communicated with [him] about [her] lawsuit."  He

brought up "the issue of [her] lawsuit for discussion" at the Faculty Senate's executive committee meeting in January 2018, and he and Dr. Peng "agreed that Dr. Vitetta should have disclosed the existence of the lawsuit to the Faculty Senate prior to her election as president-elect." Dr. Peng and Dr. Van Dermark "were concerned that Dr. Vitetta never disclosed her lawsuit to the Faculty Senate and the non-disclosure might impact her ability to serve effectively as president."

Dr. Peng convened an ad hoc committee "to review the situation and recommend a course of action." The ad hoc committee consisted of the Faculty Senate's president, past president, and chairs of its subcommittees.

According to the ad hoc committee's report, the committee's March 5, 2018 meeting "was the continuation of a series of other meetings within the executive committee of the Senate discussing how best to address the issue of Dr. Vitetta's ongoing lawsuit against the University filed in 2015."

The ad hoc committee made three recommendations to the Faculty Senate: (1) to give Dr. Vitetta "an opportunity to discuss her lawsuit formally with the members of the Senate at the next general meeting," (2) to "hold a vote as to whether a new election for Senate president should be held," and (3) if that vote were to pass, the Senate would "hold a new election for office of president in one month, with a new slate of candidates," and with Dr. Vitetta being "eligible to run for this office once again if she chooses."

The ad hoc committee gave three reasons for its recommendations: (1) "an ongoing lawsuit against the University has the potential to impact the ability of the president of the Faculty Senate to work within the committees for which [Dr. Vitetta] represents the faculty, principally the Faculty Council, as these bodies include the leadership" of UTSWMC, (2) the information "should have been given provided [sic] to senators prior to the election to allow them to make an informed decision" regarding these possibilities, and (3) Faculty Senate members "should be given the opportunity to directly inquire of Dr. Vitetta her plans and ability to work within the University structure (including Faculty Council) if she chooses to run once again for the office of president."

These recommendations were presented in the March 2018 Faculty Senate meeting, and senators voted to take a "confidence" or "no-confidence" vote in Dr. Vitetta's ability to effectively serve as president. A one-question anonymous survey was sent to the 35 senators, asking the following: "Given new information revealed regarding Ellen Vitetta's personal situation, do you have confidence that she will be able to adequately and effectively execute functions of Faculty Senate President?" Thirty-one senators responded, and nineteen answered "no."

The survey results were presented in the Faculty Senate meeting in April 2018. The senators agreed Dr. Vitetta would serve out her term as president-elect through August 31, 2018, and the senate would hold a new election for president, whose term would begin September 1, 2018.

According to Dr. Peng's affidavit, Dr. Vitetta was permitted to run again in the new election but "decided not to based on the large number of senators who voted 'no confidence.'" The senate had a new election in May 2018, and another doctor was elected to serve as president. Dr. Vitetta served as president-elect the remainder of her term and stepped down from a leadership role on August 31, 2018.

Dr. Vitetta remained on the senate as the senator from the Immunology Department.

Dr. Peng stated that "no member of the [UTSWMC] administration initiated this process or participated in any way" in the executive committee, ad hoc committee, or full Faculty Senate process. Dr. Peng, Dr. Van Dermark, and Dr. Hynan all stated, "at no time did any member of the [UTSWMC] administration direct [them] to do anything with respect to Dr. Vitetta or her role on the Faculty Senate," and they "did not work in concert with anyone to remove Dr. Vitetta from a leadership role in the Faculty Senate or to force her resignation." Each stated they "acted independently, using [their] own judgment," and stated they did not communicate with UTSWMC administration regarding Dr. Vitetta's lawsuit, her role on the Faculty Senate, the actions of the executive committee, the ad hoc committee, or the Faculty Senate's "no confidence" vote regarding her.

Dr. Hynan also stated, "At no time did anyone in [UTSWMC's] administration communicate to [her] that they did not want Dr. Vitetta to be

president of the Faculty Senate or that they would be unwilling to work with Dr. Vitetta as president of the Faculty Senate."

### b. Dr. Vitetta's Evidence

Dr. Vitetta sued UTSWMC in 2016, alleging age discrimination, sex discrimination, and retaliation for its actions regarding her salary, lab, and lab staff beginning in June 2015. In 2017, after being encouraged to do so by several others, Dr. Vitetta ran for and was elected to serve as president of UTSWMC's Faculty Senate, an independent body consisting of approximately thirty-five senators representing the 2,700 members of UTSWMC faculty on matters relating to the terms and conditions of faculty employment and the role of faculty at UTSWMC. Faculty Senators meet monthly. The Faculty Senate interacts with UTSWMC administration as it deems appropriate.

The Faculty Senate's activities and projects are overseen by an executive committee consisting of a group of three senators elected by a majority ballot to serve as president. If elected as president, over a three year period, the person elected becomes president-elect, then president, then past-president, each for one year. In addition to other duties, the past-president represents the UTSWMC faculty on the UT System's Faculty Advisory Council, which meets in Austin several times a year and discusses issues with the chancellor and other leaders of the UT system.

Dr. Vitetta was elected president and began her term as president-elect in September 2017. The other two members of the executive committee were Dr. Yan Peng, president, and Dr. Jeff Van Dermark, past-president.

In an executive committee meeting in January 2018, Dr. Van Dermark announced to Dr. Peng and Dr. Vitetta that there was a "problem" he had just learned of—specifically, that Dr. Vitetta had a "pending lawsuit against UTSWMC." He said she "should have revealed that fact to the Faculty Senate when she ran for its President" and claimed this put her in a conflict of interest, which she disputed. He insisted she "immediately disclose and discuss her lawsuit with the Faculty Senate," claiming an "urgency" to do so. Dr. Peng, as president, decided the executive committee would delay further discussion of the issue until later, after an upcoming visit by UT system officers.

In the executive committee's meeting in February 2018, Dr. Van Dermark further escalated the alleged conflict-of-interest issue, this time demanding that Dr. Vitetta resign. He became angry and insulting when she said she would not do so. His tone became "increasingly insulting, bullying, and vehement." He announced he was going to resign from the executive committee and ask others to do so as well, apparently in protest, and he stormed out of the meeting room. Dr. Van Dermark emailed Dr. Peng his resignation from the executive committee.

Dr. Vitetta learned that the chairs of the Faculty Senate subcommittees would be meeting with the executive committee after the next Faculty Senate meeting.

Dr. Vitetta attended. Dr. Van Dermark led the meeting and discussed with other senators how "a senator has a pending lawsuit and should be asked to resign." The ad hoc subcommittee decided to meet again to investigate further and adjourned without Dr. Vitetta's name being mentioned. Dr. Vitetta was invited to the follow-up meeting but declined, believing it inappropriate to attend as both the accused and part of the jury, and she believed the meeting was a mixture of both a kangaroo court and bully squad to back up Dr. Van Dermark's insistence that she resign. The ad hoc subcommittee met without her, and she was never interviewed.

At the next Faculty Senate meeting, she received a copy of the subcommittee's report. The report did not mention a conflict of interest but decided that Dr. Vitetta "could not work with UTSWMC administration on behalf of the Faculty Senate because of her pending lawsuit against UTSWMC." Dr. Vitetta objected, maintained that the senate and UTSWMC administration could continue to interact professionally on all matters related to the faculty, and discussed the fact that the senate's bylaws and other documents did not mention the issue. Dr. Vitetta told the senate she saw no reason she should resign. Another senator proposed that a secret "vote of confidence" be taken to determine how the senate felt about Dr. Vitetta moving forward to the presidency. A vote was taken, and Dr. Peng later informed Dr. Vitetta privately that the majority vote was one of "no confidence."

The Faculty Senate met on May 17, 2018. Dr. Vitetta attended, as did Dr. Peng, Dr. Linda Hynan (another past-president and current senator), Dr. Van

–61–

Dermark, who attended by phone, and other senators. In the meeting, another senator asked Dr. Vitetta "whether there was a perception on the part of the UT administration that it was problematic to have the President of the Faculty Senate be in a lawsuit against the University." Dr. Vitetta responded that she had no reason to believe so, since they were all professionals who wanted the best for UTSWMC. Dr. Vitetta discussed general aspects of her lawsuit during the meeting.

Also during this meeting, Dr. Hynan was "extremely hostile" toward Dr. Vitetta, who stated:

> Significantly, during that meeting—and much to my surprise— Dr. Hynan openly stated *that the [UTSWMC] administration had indicated that it <u>did</u> have a problem with my serving as [p]resident, and . . . <u>had</u> indicated it did not want to work with me*. She also said to the entire senate that before I became a member of the [executive committee in the 2017 timeframe], both she and [Dr.] Van Dermark had heard disparaging comments from the UT Administration about the fact that I was taking a leadership role in the [s]enate. I asked Dr. Hynan to clarify what she meant by 'disparaging comments,' in response to which she attributed the following statements to UT [a]dministration (or words to this effect): 'Oh my God this lady is going to be a Faculty Senate President and we're going to be unable to deal with her. . . you can just feel she's not the right person for us to be able to work closely together.'

Dr. Van Dermark did not contradict Dr. Hynan's summary of what the UT administration had told them and compared the situation involving Dr. Vitetta's election on the senate while having a pending lawsuit to a situation involving a tenured faculty member at UT Austin who had agreed to step down from its

executive committee after he had been convicted of a crime. Dr. Vitetta has not been convicted of anything.

Dr. Hynan's statements, and Dr. Van Dermark's failure to deny them, revealed to Dr. Vitetta that UTSWMC administration had communicated with Dr. Hynan and Dr. Van Dermark that UTSWMC administration did not want Dr. Vitetta to serve in a leadership role as president and revealed Dr. Hynan and Dr. Van Dermark had been put in a conflict of interest position as agents for UTSWMC administration for the purpose of forcing Dr. Vitetta to resign from the senate because of her pending discrimination and retaliation lawsuit.

The vote of no confidence by the Faculty Senate, combined with the admission that the administration did not want to work with her and had initiated this whole process by turning two colleagues against her, convinced Dr. Vitetta to say that she might step down from the presidency. She asked for the weekend to give them her final decision.

After that meeting, Dr. Vitetta asked for but was denied a meeting with the ad hoc subcommittee, hoping to clarify several details regarding Dr. Hynan's disclosure. Afterwards, Dr. Vitetta received rude emails from both Dr. Hynan and Dr. Van Dermark confirming how completely they had been turned against her as a result of UTSWMC administration's comments, which confirmed for Dr. Vitetta that while the senate was supposedly an independent body, it could be manipulated and intimidated as the administration saw fit.

Dr. Vitetta explained these events to her department chair but said she still wished to serve as senator from the Immunology Department and to complete an important mentoring initiative she had already begun. Her chair had no objections and had rated her with an "exceeds expectations" rating on her annual faculty evaluation in part because of her work on the Faculty Senate.

Dr. Vitetta maintains that, in the absence of any specific policy, the UTSWMC administration—working through Dr. Van Dermark and Dr. Hynan—set up a situation in which Dr. Vitetta would be forced to resign from her role as president of the Faculty Senate, ruining her relationship with Dr. Van Dermark and Dr. Hynan, and depriving her of an opportunity to serve in an important role to lead UTSWMC's Faculty Senate.

### 2. Adverse Action (Faculty Senate)

UTSWMC also argues the trial court lacked jurisdiction over this retaliation claim because Dr. Vitetta has failed to establish an adverse employment action by UTSWMC. We consider below whether Dr. Vitetta raised a fact issue on this and conclude that she did.

We turn first to whether she raised a fact issue on an adverse employment action by UTSWMC. In *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. at 57, the Supreme Court analyzed the retaliation provisions under Title VII of the Civil Rights Act of 1964 and held that Title VII's retaliation provisions are not limited to actions related to employment or those occurring at the workplace. *Id.* at 57. Instead, Title

–64–

VII's retaliation provisions require only that the actions be materially adverse to a reasonable employee or job applicant, meaning that the employer's actions "must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* In reaching this conclusion, the Supreme Court rejected the Fifth Circuit's prior decision in *Mattern v. Eastman Kodak Co.*[33] and other cases that limited actionable retaliatory conduct to ultimate employment actions such as hiring, granting leave, discharging, promoting, and compensating. *Burlington N. & Santa Fe v. White*, 548 U.S. at 60, 67. The Court noted that "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace" and that limiting retaliation protections to employment-related actions "would not deter the many forms that effective retaliation can take." *Id*. at 63.

On the adverse action element, UTSWMC first argues that no adverse action exists because Dr. Vitetta's role as president was an elected, voluntary role. Under the facts here, considering both the prestige and the influence a position as president of UTSWMC's Faculty Senate offers, we conclude that Dr. Vitetta has raised a genuine issue of fact on whether the action was sufficiently harmful to dissuade a reasonable worker from complaining of discrimination and thus believe the action was sufficiently adverse to raise a fact issue. *See id*. at 57; *cf. Cristofaro v. Lake*

---

[33] 104 F.3d 702, 707 (5th Cir.), *cert. den.*, 522 U.S. 932 (1997).

*Shore Cent. Sch. Dist.*, 473 F. App'x 28, 31–32 (2d Cir. 2012) (affirming summary judgment on high school teacher's retaliation claim on grounds that denial of unpaid dance-team advisor position did not constitute adverse action for retaliation purposes).[34]

Next, UTSWMC argues no adverse action exists because the Faculty Senate, not UTSWMC, was responsible for the events involving Dr. Vitetta's role on the Faculty Senate. While UTSWMC has presented evidence supporting that position, Dr. Vitetta has presented evidence raising a fact issue on that question.

Based on the evidence, a reasonable fact-finder could conclude that UTSWMC administration negatively reacted to Dr. Vitetta's lawsuit, communicated that to Dr. Van Dermark and Dr. Hynan in words conveying UTSWMC had a problem with Dr. Vitetta and did not want to work with her, and that these communications influenced Dr. Van Dermark and Dr. Hynan's own negative comments to the other members of the Faculty Senate, who then expressed their own concerns about Dr. Vitetta's role because of her lawsuit, before a majority of them cast a vote of no confidence in her. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 417,

---

[34] *Cristofaro* is distinguishable from the facts here. Though both cases involve alleged retaliation in connection with voluntary roles, the differences between the relative prestige and influence the two positions offered is significant. Here, Dr. Vitetta alleges retaliation in connection with a role that allowed her to serve in a leadership position on an official, governing body representing roughly 2,700 faculty members in connection with the terms and conditions of their employment, while the plaintiff in *Cristofaro* was denied a role as an advisor to a student dance team. We recognize, of course, that the positions were important to each of the plaintiffs, but the loss of the Faculty Senate role appears much more likely to dissuade a reasonable worker from complaining of discrimination under *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. at 68 (outlining proper retaliation standard).

422 (2011) (confronting problem when an official who engages in adverse employment action has no discriminatory animus but is influenced by animus in someone else; court indicates employer may be liable when the person who did not control ultimate employment action (a supervisor there) performs an act motivated by unlawful animus that is intended to and that does in fact cause the ultimate employment action); *Gonzalez v. Champion Techs., Inc.*, 384 S.W.3d 462, 474 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (applying *Staub* to TCHRA retaliation claim and concluding evidence raised fact issue on prima facie case, stating "[d]iscriminatory animus by a person other than the decision-maker may be imputed to an employer if person in question possessed leverage or exerted influence over the decision-maker.")

### 3. Causal Connection (Faculty Senate)

UTSWMC also argues the trial court lacked jurisdiction over this retaliation claim because Dr. Vitetta has failed to establish the necessary causal connection between her protected activity and her departure from her role as Faculty Senate president. We consider whether Dr. Vitetta raises a fact issue on this and conclude that she did.

UTSWMC argues that, as a matter of law, the eighteen months between the time she filed her lawsuit and the occurrence of the events involving her Faculty Senate role is too long as a matter of law to establish the necessary causal link. UTSWMC cites *Donaldson v. Tex. Dep't of Aging and Disability Servs.*, 495 S.W.3d

421 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) to support this argument. *Donaldson* is distinguishable from the facts here. There, the court concluded that a six month period between a protected activity and adverse event were insufficient to raise a fact issue, but the only other evidence the plaintiff presented in that case was that the decision maker knew about the protected activity. *Id.* at 443–44.

Here, while Dr. Vitetta first filed her lawsuit in July 2016, the evidence reflects that UTSWMC's first opportunity to engage in any adverse action regarding her role as president of the Faculty Senate occurred in September 2017, when her service as president-elect began. The executive committee meetings, ad hoc subcommittee meetings, and Faculty Senate meetings that led to her departure from the Faculty Senate began in January 2018 and continued through at least May 2018, a period beginning just four months after that first opportunity, and most importantly, the communications expressed during these meetings consistently reflected an ongoing negative attitude toward Dr. Vitetta's lawsuit. *See Alamo Heights*, 544 S.W.3d at 782, 790 (explaining causation standard for *McDonnell Douglas* prima facie case element is "not onerous" and can be satisfied merely by proving close timing between the protected activity and the adverse action, and indicating that expression of a negative attitude towards the protected activity is among several factors court may consider).

In fact, it appears undisputed that the events leading up to the adverse action were directly motivated by Dr. Vitetta's lawsuit. A fact-finder could conclude from

Dr. Van Dermark's, Dr. Peng's, and Dr. Hynan's affidavits that Dr. Vitetta's lawsuit prompted the discussions and actions taken here. Dr. Van Dermark states that "in January 2018, [he] brought the issue of Dr. Vitetta's lawsuit up for discussion" in an executive committee meeting and believed she "should have disclosed the existence of the lawsuit to the Faculty Senate prior to her election."

Similarly, Dr. Peng states that in that meeting, "Dr. Van Dermark brought it to my attention that Dr. Vitetta had a pending lawsuit against [UTSWMC] and that he and Dr. Van Dermark "were concerned that Dr. Vitetta never disclosed her lawsuit to the Faculty Senate and the non-disclosure might impact her ability to effectively serve as president." Dr. Peng convened the ad hoc committee "to review the situation and recommend a course of action."

Dr. Hynan, who served on that ad hoc committee, states the ad hoc committee "considered whether Dr. Vitetta should have disclosed the existence of a lawsuit against [UTSWMC] to the Faculty Senate prior to her election."

The evidence also indicates that UTSWMC administration conveyed a negative attitude to Dr. Hynan and Dr. Van Dermark about Dr. Vitetta, and this was discussed in the same meeting in which Dr. Vitetta was asked "whether there was a perception on the part of the UT administration that it was problematic to have the President of the Faculty Senate be in a lawsuit against the University." During this meeting, Dr. Hynan was "extremely hostile" toward Dr. Vitetta, stated that UTSWMC administration had "a problem" with her serving as president, and that

–69–

"UTSWMC administration had indicated it not want to work with her." This evidence is sufficient to raise a genuine fact issue on the causal connection element of her prima facie claim.

We overrule UTSWMC's first issue on this claim.

## IV. Conclusion

We affirm the trial court's order denying UTSWMC's plea to the jurisdiction on Dr. Vitetta's age discrimination claims and sex discrimination claims involving the 2015 cuts to her salary and her lab. We also affirm the court's order denying UTSWMC's plea on Dr. Vitetta's retaliation claim involving her role on the Faculty Senate. We reverse the trial court's order and dismiss for lack of jurisdiction Dr. Vitetta's retaliation claim involving the 2015 cuts to her lab.

/Ken Molberg/
190105f.p05                                    KEN MOLBERG
                                               JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

UNIVERSITY OF TEXAS
SOUTHWESTERN MEDICAL
CENTER, Appellant

No. 05-19-00105-CV        V.

ELLEN S. VITETTA, Appellee

On Appeal from the 101st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-09146.
Opinion delivered by Justice Molberg
and Justice Partida-Kipness
participating.

In accordance with this Court's opinion of this date, the trial court's order denying UTSWMC's plea to the jurisdiction is **AFFIRMED** in part and **REVERSED** in part. We **AFFIRM** the trial court's order denying UTSWMC's plea to the jurisdiction on Dr. Vitetta's age discrimination claims and sex discrimination claims involving the 2015 cuts to her salary and her lab. We also **AFFIRM** the court's order denying UTSWMC's plea on Dr. Vitetta's retaliation claim involving her role on the Faculty Senate. We **REVERSE** the trial court's order and dismiss for lack of jurisdiction Dr. Vitetta's retaliation claim involving the 2015 cuts to her lab. We **REMAND** this cause to the trial court for further proceedings consistent with this opinion.

Judgment entered this 28th day of September, 2020.